## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Michael T. Rose,                             Case No. 14-cv-848 (PJS/TNL)

        Plaintiff,

v.                                   **REPORT &**
                                 **RECOMMENDATION**

Carolyn W. Colvin,
Acting Commissioner of Social Security,

        Defendant.

---

Neut L. Strandemo, Strandemo Sheridan & Dulas, PA, 1380 Corporate Center Curve, Suite 320, Eagan, MN 55121 (for Plaintiff); and

Ana H. Voss and Pamela Marentette, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

---

## I. INTRODUCTION

Plaintiff Michael T. Rose brings the present case, contesting Defendant Commissioner of Social Security's denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. This matter is before the undersigned United States Magistrate Judge on cross motions for summary judgment, Plaintiff's Motion for Summary Judgment (Docket No. 9) and Defendant's Motion for Summary Judgment (Docket No. 11). These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Patrick J. Schiltz, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Docket No. 9) be **DENIED** and Defendant's Motion for Summary Judgment (Docket No. 11) be **GRANTED**.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB in March 2011, asserting that he has been disabled since August 15, 2009, due to affective/mood and panic disorders, including bipolar disorder and depression as well as rage, panic, and anxiety attacks. (Tr. 105-06, 115, 229, 231.) Plaintiff also reported that he was disabled due to ADHD/ADD and had difficulty concentrating and recalling information on a short-term basis. (Tr. 106.) Plaintiff's application was denied initially, and again upon reconsideration. (Tr. 105-114, 115, 116-27, 128, 135-39, 140, 141-43, 144.) Plaintiff appealed the reconsideration determination by requesting a hearing before an administrative law judge ("ALJ"). (Tr. 145-46; *see also* Tr. 147-48, 149-50.)

The ALJ held a hearing on January 2, 2013.[1] (Tr. 17, 38; *see also* Tr. 207, 213, 224.) After receiving an unfavorable decision from the ALJ, Plaintiff requested review by the Appeals Council, which denied his request for review. (Tr. 1-37; *see also* Tr. 340-46.) Plaintiff then filed the instant action, challenging the ALJ's decision. (Compl., ECF No. 1.) Plaintiff moved for summary judgment on August 1, 2014 (ECF No. 9), and the

---

[1] The hearing was initially scheduled for October 5, 2012. (Tr. 80, 160; *see also* Tr. 183, 185.) While Plaintiff's counsel was present at the October hearing, Plaintiff did not appear. (Tr. 82, 189, 191, 195, 197.) It was subsequently determined that Plaintiff had "good reason" for not appearing at the October hearing and the hearing was rescheduled. (Tr. 42; *see* Tr. 202-03, 335.)

Commissioner filed a cross motion for summary judgment on September 14, 2014 (ECF No. 11). This matter is now fully briefed and ready for a determination on the papers.

## III. RELEVANT MEDICAL HISTORY

Plaintiff challenges only the ALJ's findings and decision relating to his mental impairments. Accordingly, the Court focuses on the records relevant to these impairments.

### A. Pre-2009

Since at least as early as 2006, Plaintiff was diagnosed with bipolar disorder and panic disorder with agoraphobia and reported feelings of depressed mood, anxiety/panic, low energy, and suicidal thoughts. (Tr. 363, 364.) There is no dispute that Plaintiff has been under the care of John R. Shirriff, M.D., a psychiatrist, since, as described by the ALJ, "long before the alleged date of onset."[2] (Tr. 30; *see* Pl.'s Mem. in Supp. at 1, 4, ECF No. 10; Def.'s Mem. in Supp. at 5, ECF No. 12.)

### B. 2009

Plaintiff was scheduled for a medication check with Dr. Shirriff in early March 2009, but did not appear for the appointment. (Tr. 356.)

Plaintiff next saw Dr. Shirriff in May for a medication check. (Tr. 355.) Plaintiff reported that he had discontinued taking Adderall because it caused him to feel hyper and sweat. (Tr. 355.) Plaintiff noted, however, that it did improve his concentration. (Tr. 355.) Dr. Shirriff noted that Plaintiff was employed, but that there had been layoffs and

---

[2] Based on a disability report completed by Plaintiff, it appears that Plaintiff has been under the care of Dr. Shirriff since 1999. (Tr. 267; *see also* Tr. 42 (under care of Dr. Shirriff for 13 years).)

Plaintiff was concerned about losing his job.  (Tr. 355.)  Dr. Shirriff noted that Plaintiff's "mood has been going up and down despite his taking the Lamictal and Seroquel."  (Tr. 355.)  Dr. Shirriff increased Plaintiff's Seroquel prescription and told Plaintiff to return in two months.  (Tr. 355.)  Plaintiff's diagnoses were listed as bipolar disorder and panic disorder with agoraphobia.  (Tr. 355.)

Plaintiff returned to Dr. Shirriff approximately two months later, reporting that he felt "OK, same old same old."  (Tr. 354.)  Plaintiff reported being concerned over his wife losing her job as well as feeling "subdued" and not "interested in talking to his wife."  (Tr. 354.)  Plaintiff told Dr. Shirriff that "[h]e goes out to his shop and putzes around, but otherwise isn't very enthusiastic about life."  (Tr. 354.)  Plaintiff asked about lithium, which had been prescribed when Plaintiff was younger but not used as Plaintiff was managing his depression with exercise at the time.  (Tr. 354.)  Dr. Shirriff reduced Plaintiff's Seroquel prescription and advised Plaintiff to return in four weeks.  (Tr. 354.)

When Plaintiff saw Dr. Shirriff in early September, he told Dr. Shirriff that he "lost [his] job about a month ago . . . [for] no reason."  (Tr. 353.)  Plaintiff reported being concerned about finances and stated that he would run out of medication in approximately two weeks.  (Tr. 353.)  Dr. Shirriff and Plaintiff discussed starting lithium, and Plaintiff was to have some preliminary lab work completed.  (Tr. 353; *see* Tr. 352.)  Dr. Shirriff gave Plaintiff samples of Lexapro and Seroquel and told him to return in three months.  (Tr. 353.)

In November, Plaintiff saw Dr. Shirriff for a medication check.  (Tr. 362, 352.)  Plaintiff reported receiving unemployment benefits and looking for a new job, spending

approximately six hours per day on the computer.  (Tr. 362, 352.)  Plaintiff reported "some trouble getting out of bed on some days."  (Tr. 362; *accord* Tr. 352.)  Dr. Shirriff noted Plaintiff would continue his Lamictal, Seroquel, and Wellbutrin prescriptions.  (Tr. 362.)  Dr. Shirriff assessed Plaintiff as "[d]oing OK."  (Tr. 362; *accord* Tr. 352.)  Dr. Shirriff and Plaintiff discussed the benefits and risks of taking lithium, but it was decided that Plaintiff would remain on Lamotrigine for now.  (Tr. 352.)

### C. 2010

Dr. Shirriff saw Plaintiff for another medication check in January 2010.  (Tr. 361.)  Plaintiff reported that "[h]e is getting some job offers[,] but one was in Rochester, another was for low pay."  (Tr. 361; *accord* Tr. 351.)  Plaintiff stated that "[h]e misses the socializing of a regular job," but stated that he was "feeling less motivated to look for jobs."  (Tr. 361; *accord* Tr. 351.)  Dr. Shirriff described Plaintiff as "[c]oping with unemployment."  (Tr. 361; *accord* Tr. 351.)  Dr. Shirriff noted that Plaintiff "has not been exercising, despite having a lot of free time."  (Tr. 361; *accord* Tr. 351.)  Dr. Shirriff also noted that Plaintiff "is getting Citalopram rather than Lexapro."  (Tr. 361; *accord* Tr. 351.)  Dr. Shirriff encouraged Plaintiff to exercise and gave him samples of Seroquel XR and Lexapro.  (Tr. 351, 361.)

In February, Plaintiff was seen for an unrelated physical condition.  (Tr. 411.)  The treatment provider noted bipolar disorder as an active condition.  (Tr. 411.)

When Plaintiff returned to see Dr. Shirriff in July, he had a part-time job driving a fork truck.  (Tr. 350, 360.)  Plaintiff reported that "[h]is mood has been pretty good."  (Tr. 360; *accord* Tr. 350.)  Plaintiff had also lost approximately 20 pounds.  (Tr. 350,

360.)  Dr. Shirriff continued Plaintiff's medications and told Plaintiff to return in six months.  (Tr. 350, 360.)

## D.  2011

At his annual physical in January 2011, Plaintiff's treatment provider noted "[n]o depression or anxiety" and active bipolar disorder.  (Tr. 414-15.)

Plaintiff saw Dr. Shirriff again in March.  (Tr. 349, 350, 359.)  Plaintiff was no longer working, stating "[h]e tried a couple [of] jobs but was let go . . . [as] he didn't function consistently well."  (Tr. 359; *accord* Tr. 349, 350.)  Plaintiff reported that "[h]e has been helping his aging parents and likes working with older people, is considering getting the training to become a certified nursing assistant."  (Tr. 359.)  Plaintiff also reported that he was considering applying for Social Security benefits.  (Tr. 349, 350, 359.)

Additionally, Plaintiff reported that he had "tr[ied] his brother's Ritalin and felt 'less' hyper."  (Tr. 359; *accord* Tr. 349, 350.)  Dr. Shirriff discussed switching Plaintiff from Adderall to Ritalin, but ultimately continued Plaintiff's present medications.  (Tr. 349, 350, 359.)  Dr. Shirriff assessed Plaintiff as "doing okay."  (Tr. 359; *accord* Tr. 349, 350.)

In October, Plaintiff saw Dr. Shirriff for a medication check.  (Tr. 409.)

## E. 2012

On January 31, 2012, Plaintiff met with Candice Beckham-Chasnoff, MS, LMFT. (Tr. 407; *see also* Tr. 410.)  Plaintiff had a PHQ-9 score of 26[3] and reported the following symptoms:

> Lifelong mood instability, panic attacks, periods of depression alternating with periods of mania, inability to hold a job (due to mood dysregulation, impaired memory, manic episodes, poor impulse control), difficulty concentrating, poor ability to follow through with own goals and plans, anger outbursts, intermittent bouts of memory loss and confusion, low energy, low motivation, feelings of worthlessness, anxiety, irritability, [and] unstable interpersonal relationships.

(Tr. 407.)

Beckham-Chasnoff observed that Plaintiff was well-groomed and dressed appropriately, made appropriate eye contact, and was oriented and cooperative.  (Tr. 408.)  Plaintiff's mood was "euthymic."  (Tr. 408.)  He had normal speech patterns, his judgment and insight were intact, and his thought processes were "organized" and "coherent."  (Tr. 408.)  Plaintiff's memory was within normal limits.  (Tr. 408.)

Beckham-Chasnoff noted Plaintiff's bipolar diagnosis as well as the following: "Conflictual relationship with ex-wife.  Estranged from 15-year-old son for the past 2

---

[3]

> The Patient Health Questionnaire, PHQ–9, is used to screen, diagnose, monitor, and measure the severity of depression. Center for Quality Assessment and Improvement in Mental Health, available at http://www.cqaimh.org/pdf/tool_phq9.pdf. Scores of 15–19 indicate moderately severe major depression that warrants treatment with an antidepressant or psychotherapy. *Id.* Scores of 20 and greater indicate severe major depression that warrants treatment with an antidepressant and psychotherapy. *Id.* The highest possible score is 27, if the individual has endorsed all nine categories of symptoms occurring nearly every day. *Id.*

*Ramo v. Colvin*, No. 13-cv-1233 JRT/JJK, 2014 WL 896729, at *5 (D. Minn. Mar. 6, 2014).

years.  Estranged from family of origin for the past year.  Has lost 12 jobs in the past 7 years due to his mental health problems.  Financial problems."  (Tr. 408; *see* Tr. 410.) Beckham-Chasnoff also noted that Plaintiff "has a long history of suicidal ideations, and he currently reports chronic, passive suicidal ideations in the context of a severe bout of depression."  (Tr. 408.)  Beckham-Chasnoff recommended that Plaintiff return for individualized therapy.  (Tr. 408.)

Plaintiff saw Beckham-Chasnoff again in February, at which time they worked on Plaintiff's "anger issues and why he is compelled to speak his mind in situations when he knows 'social polish' requires him to keep more of []his thoughts to himself more often." (Tr. 405.)  They also "[e]xplored feelings of worthlessness related to [Plaintiff's] mental health problems, his job h[istory], and aging" and "[t]alked about ways to break out of his cycle of low energy/anhedonia."  (Tr. 405.)

Plaintiff next met with Beckham-Chasnoff approximately three weeks later.  (Tr. 403.)  During this session, they "[t]alked about [Plaintiff's] typical day, which sounds extremely understimulating and isolative."  (Tr. 403.)  They "[d]isc[usse]d making more of a routine during his week so that he has something active (at least one thing) to do each day."  (Tr. 403.)  Beckham-Chasnoff "[a]lso taught auto/wise mind concepts to give [Plaintiff] a framework for combatting []his own primitive/depressive/angry inclinations."  (Tr. 403.)

A few days later, Plaintiff saw Dr. Shirriff.  (Tr. 401.)  Dr. Shirriff noted that this was Plaintiff's first visit in approximately one year and Plaintiff explained that he had not been able to come in due to financial reasons.  (Tr. 401.)  Plaintiff reported that his

"mood has been worse the past six months," describing a "sadness, like [his] heart is breaking." (Tr. 401.) Plaintiff also "talked about episodes of rage, i[.]e[.,] dealing with the auto dealer regarding his wife's car tires," which Dr. Shirriff noted "has been a long time problem." (Tr. 401.)

Dr. Shirriff observed that Plaintiff was "casually dressed and well groomed," had a normal speech and behavior patterns, had good insight and judgment, and was cognitively "grossly intact." (Tr. 401.) Plaintiff's "mood [was] moderately depressed, [and his] affect congruent with [his] mood." (Tr. 401.) Plaintiff asked Dr. Shirriff about lithium. (Tr. 401.) Dr. Shirriff started Plaintiff on lithium and told him to return in four weeks. (Tr. 401.)

During his annual physical in March, Plaintiff's treatment provider noted "[n]o depression or anxiety" and active bipolar disorder. (Tr. 420-21.)

Plaintiff's next session with Beckham-Chasnoff was in mid-March. (Tr. 399.) Beckham-Chasnoff noted that Plaintiff had slept in and was an hour late to his session. (Tr. 399.) Beckham-Chasnoff "talked with [Plaintiff] about strategies for keeping his app[ointmen]ts in the future." (Tr. 399.) They also talked about Plaintiff's employment history and his "grief re[garding] no longer being able to hold down the kind of high[-]energy, high[-]stimulation jobs he used to have back in the 80s and early 90s." (Tr. 399.)

When he saw Beckham-Chasnoff ten days later, Plaintiff "report[ed] feeling diminished energy, motivation, and drive now that he has been on Lithium for a few weeks." (Tr. 397.) Plaintiff also reported feeling "flat." (Tr. 397.) Beckham-Chasnoff

"worked on clarifying [Plaintiff's] therapy goals," of which "be[ing] more production and hav[ing] more structure in his life on a daily basis" was the primary goal. (Tr. 397.) Beckham-Chasnoff noted that Plaintiff "does not feel he can begin really working on this until his medications have stabilized him" and, in the meantime, "he would like to cont[inue] working on maintaining hope and perspective." (Tr. 397.)

One week later, Plaintiff had another session with Beckham-Chasnoff. (Tr. 395.) During this session, Plaintiff "report[ed] serious depression symptoms including regular [suicidal ideation]," which Beckham-Chasnoff described as "having an ego dystonic urge . . . to 'eat a bullet.'" (Tr. 395.) Plaintiff stated that he has not wanted to act on these thoughts or taken any steps to harm himself. (Tr. 395.) Plaintiff agreed to give his firearms to one of his siblings for the time being. (Tr. 395.) Beckham-Chasnoff also noted that Plaintiff feels "that he still does not have enough energy to commit to a regular routine or to tasks with deadlines." (Tr. 395.) Beckham-Chasnoff further noted that Plaintiff "is planning to do some yardwork today, which he can do at his own pace[, a]nd he is thinking of putting in a gas fireplace this fall, which he can also do at his own pace." (Tr. 395.)

The following day, Plaintiff met with Dr. Shirriff. (Tr. 393.) Plaintiff noted that "[t]he lithium has physically and mentally slowed [him] down and has helped with the anger." (Tr. 393.) Dr. Shirriff noted that Plaintiff's "mood has been 'a little bit down.'" (Tr. 393.) With respect to the suicidal ideation, Dr. Shirriff noted that Plaintiff's "comment about 'eating a bullet' is something he has thought about for many years, but

doing so 'sounds painful' to him." (Tr. 393.) Dr. Shirriff increased Plaintiff's lithium prescription and told him to return in four to six weeks. (Tr. 394.)

Plaintiff's bipolar disorder was noted again when he was seen for an unrelated physical condition in April. (Tr. 427.)

Plaintiff met with Beckham-Chasnoff three times during the month of April. During the first session, they again discussed what Plaintiff wants out of therapy. (Tr. 391.) Plaintiff identified three goals:

> 1) maintaining a stable mood and particularly developing skills to regulate mood so he doesn't have to rely solely on medications, 2) feeling good about himself/making peace with the ways in which his mind and body are slowing down, [and] 3) using therapy to simply vent and express himself as he feels he has few outlets for this in his life.

(Tr. 391.) Beckham-Chasnoff noted that Plaintiff "has a hard time organizing his thoughts, so this took a bit of effort for him." (Tr. 391.) Plaintiff rated his mood on this occasion "as a '6' on a scale of 0-10 (with 10 being euphoric, 5 being content, and 0 being deeply depressed)." (Tr. 391.)

During the second session, Beckham-Chasnoff and Plaintiff discussed Plaintiff's "mixed feelings about applying for disability—feels hopeful about the ways this might open up opportunities for him in his life, and also feels discouraged that he needs this type of support." (Tr. 389.) They also "[p]rocessed [Plaintiff's] new goals of . . . walking around the lakes . . . [and] taking some classes." (Tr. 389.) During the third session, Plaintiff reported that "he has been thinking more about 'mortality' lately," and

so they "[p]rocessed his feelings about death, his spiritual beliefs, and his belief in the supernatural. (Tr. 387.)

Plaintiff met with Beckham-Chasnoff again in May. (Tr. 385.) During this session, Plaintiff "wanted to play some songs today (on his iPod) that he recorded with his band, ASO, 5 years ago." (Tr. 385.) They "[l]istened to the songs and then processed what [the songs] mean[t] to [Plaintiff], why they're on his mind today, [and] what kinds of emotions he's dealing with lately that are reflected in these songs." (Tr. 385.) They also "talked about how [Plaintiff] has been structuring his days lately, [and] how he has been finding meaning and purpose in his life." (Tr. 385.) Plaintiff told Beckham-Chasnoff that "he planted several 8 ft. trees in his yard" the day before. (Tr. 385.)

Plaintiff also saw Dr. Shirriff the same day. (Tr. 383.) Plaintiff reported that "his mood has been stable" and he "feel[s] that rage is kind of behind the barrier of the lithium." (Tr. 383.) Plaintiff mentioned feeling unstable walking and having a tremor. (Tr. 383.) He also reported that "[h]is energy/motivation ha[s] been 'getting worse every day.'" (Tr. 383.) Dr. Shirriff "discussed the 'seduction of mania,' which seemed to resonate with [Plaintiff]." (Tr. 383.) Dr. Shirriff reminded Plaintiff that he needed to stay hydrated while talking lithium and prescribed propranolol for the tremor. (Tr. 383.) Plaintiff was instructed to return in six weeks. (Tr. 383.)

Plaintiff's bipolar disorder was noted again when he was seen for an unrelated physical condition in June. (Tr. 30.)

## IV. DISABILITY-RELATED REPORTS & ASSESSMENTS

In April 2011, Plaintiff completed a Disability Report. (Tr. 263.) Plaintiff reported that the following conditions limit his ability to work: bipolar disorder; depression; panic, anxiety, and rage attacks; ADHD/ADD; anger; and annoyance as well as the inability to concentrate and recall information on a short-term basis. (Tr. 264.) Plaintiff reported that he last worked in October 2010, explaining that he stopped working due to "[c]onfrontation with co-workers and management, no short[-]term memory recall, anxiety attacks with full body sweats, short with people generally resulting in termination[, and for c]halleng[ing] authority figures." (Tr. 264.) When asked if his conditions "cause[d him] to make changes in [his] work activity," Plaintiff answered, "No." (Tr. 264.)

Plaintiff listed Klonopin, Lamictal, Lexapro, Ritalin, Seroquel XR, and Wellbutrin XL as his current medications and Dr. Shirriff as his treatment provider. (Tr. 267.) Plaintiff reported that he was treated for "[s]evere sweating, generally caused by panic or anxiety attacks, hostile feelings toward co-workers and those in authority, irritability toward customers[,] slow memory recall[,] and concentration issues." (Tr. 268; *accord* Tr. 277.) Plaintiff reported that, "[o]ver the past 25 years. . . ," he has tried a number of things to treat his conditions, including self-hypnosis, biofeedback, self-imaging, exercise, a vegetarian diet, self-help books, group therapy, experimental treatments, medication, and hormone studies. (Tr. 268; *accord* Tr. 277.) Plaintiff reported that he "go[es] every 3-4 months for [his] med checkups" and "every 3 months to [a] family doctor for a blood test to check [his] medication levels." (Tr. 268.)

Around the same time, Plaintiff also completed a Function Report. (Tr. 270.) Plaintiff stated that his conditions limited his ability to work by causing panic and anxiety attacks that produced severe sweating and irritability. (Tr. 270.) Plaintiff stated he had hostile feelings towards persons in charge, coworkers, and customers. (Tr. 270; *accord* Tr. 277.) Plaintiff also stated he had severe mood swings; at times, feels "frozen in one spot"; and sometimes gets so angry that he "see[s] red." (Tr. 270.)

When describing his daily activities, Plaintiff stated that he takes his medications in the morning, has a bowl of cereal, watches the news, calls his parents and wife, and tries to read one to two chapters of a book. (Tr. 271.) Plaintiff stated that he had no trouble with his personal care and also took care of a pet. (Tr. 271.) Plaintiff stated that he used a plastic, day-of-the-week container to help him remember to take his medication and his wife also reminded him. (Tr. 272.) Plaintiff reported that he did not prepare his own meals because he was "to[o] depressed and anxious to the point [he is] not hungry." (Tr. 272.) Plaintiff stated that his sleep was affected, reporting that he woke up on and off, was restless, and dreamed. (Tr. 271.)

Plaintiff noted that "[his] moods change so frequent from day to day it[']s hard to plan my condition and to secure a better state of mind for the next situation." (Tr. 271.) Plaintiff stated that, previously, he had been able to interact with customers on the phone and in person, multitask, handle moderate stress, and get along with management and coworkers. (Tr. 271.) Plaintiff reported that on "many days" he is "unable to do anything," but on some days he is able to do yard work and home repairs. (Tr. 272.)

Plaintiff reported that "[his] wife needs to remind [him] on more than one occasion to start or complete something." (Tr. 272.)

Plaintiff reported that he rarely goes outside in the winter, but goes outside as often as possible during "warmer weather." (Tr. 273.) Plaintiff stated that he gets around by walking and driving and riding in a car. (Tr. 273.) Plaintiff reported that he had no trouble going out alone. (Tr. 273.) Plaintiff also reported that he shopped twice a week for approximately two hours in stores and online for computer programs, clothing, groceries, and books. (Tr. 273.) Plaintiff stated he was not able to count change because he has "a difficult time with numbers," but is otherwise able to handle his finances. (Tr. 273; *accord* Tr. 274.)

Plaintiff listed his hobbies as home movies, reading the news online, movies, playing guitar, riding his bike, and walking. (Tr. 274.) Plaintiff stated that he tries to do these "as often as [he is] able [to]" when he is not anxious or nervous. (Tr. 274.) Plaintiff reported that his conditions result in a lack of interest and inability to concentrate. (Tr. 274.) Plaintiff also reported that he does not have "any patience to complete projects." (Tr. 274.)

Plaintiff reported socializing with others through Facebook, playing online games and completing quizzes, and writing letters to friends. (Tr. 274.) Plaintiff stated that he attended church weekly and visits family members and the library. (Tr. 274.) Plaintiff stated that he needs to be reminded to go places, and will try to write down or enter into his cellphone events that are more than a few days out. (Tr. 274.) When getting along with others, Plaintiff stated that he "can be argumentative, defensive, loud, quiet[,] and at

other times unpredictable (rage and anger attacks)." (Tr. 275.) When asked about how his conditions affected his ability to socialize with others, Plaintiff reported that he loses interest in conversations and "other people and their problems" and has a "low tolerance to most other situations." (Tr. 275.)

Plaintiff reported that his conditions affect his ability to talk, remember things, complete tasks, concentrate, understand, follow instructions, and get along with others. (Tr. 275.) Plaintiff noted having concerns about panic attacks more often and forgetting mid-conversation what he was talking about. (Tr. 276.) Plaintiff explained that he stutters, talks fast, has trouble with short-term memory, and is unable to focus for long periods of time. (Tr. 275.) Plaintiff stated that he has difficulty understanding and following instructions when he is stressed. (Tr. 275.) Plaintiff reported that "worst of all is losing my sense of humor." (Tr. 275.) Plaintiff reported that he usually asks for written instructions and can pay attention for five to ten minutes before needing "to start over." (Tr. 275.) Plaintiff reported that he can become disoriented and lose his sense of direction at times, such as when coming out of a shopping mall. (Tr. 275.)

Plaintiff stated that he had trouble with authority figures, including challenging management and coworkers. (Tr. 276.) Plaintiff reported that he had previously been terminated because of his inability to get along with others. (Tr. 276.) Plaintiff reported that his ability to handle stress was poor and further decreased when placed under time constraints. (Tr. 276.)

On June 1, 2011, Plaintiff participated in a consultative examination conducted by John F. Cooper, Psy. D. (Tr. 366-67.) Dr. Cooper noted that Plaintiff reported, and

available records showed, that Plaintiff has been diagnosed with and treated for bipolar disorder, ADHD, and panic by Dr. Shirriff for the last 10 years. (Tr. 366.) Dr. Cooper noted that Plaintiff was currently taking Lexapro, Lamictal, Wellbutrin, Seroquel, Klonopin, and Adderall. (Tr. 366.)

Dr. Cooper noted that Plaintiff "has been hospitalized on at least on[e] and possible two or three other occasions, significantly six years ago . . . after he was found by his wife with a gun in his mouth." (Tr. 366.) Plaintiff reported feeling "invincible" while doing some undercover work in Atlanta and "would challenge gang members in provocative ways." (Tr. 366.) Dr. Cooper also noted the following:

> He alleges hallucinations of unclear proportions when he sees flashes of animals or feels "outside of reality" though his explanation is hard to follow. He suggests he has a lot of fears of death. He currently endorses the following mood symptoms at largely moderately severe levels: sadness, mood swings, anxiousness, poor concentration, agitation, mind racing, fatigue, irritability, and memory impairment. He suggest he does not cycle so much anymore with his last manic or hypomanic symptoms occurring two months ago— "I [am] mostly depressed." He readily endorses panic symptoms which have been helped with the Seroquel. He used to have them 1 to 2 times a day though now is largely triggered by anticipatory anxiety such as at social events where he might get palpitations, sweats, and desires to avoid situations. He does not fear panic itself. With respect to ADHD, he suggests having long-standing problems with focus in school and had been on Ritalin for many years.

(Tr. 366.)

Dr. Cooper observed that Plaintiff was "alert, oriented, and prompt for the appointment" and "easily engaged with a pleasant, anxious manner." (Tr. 366.) Plaintiff's "[m]ood appeared anxious with corresponding affect, including dry mouth"

and his "[t]hinking was linear without evidence of psychosis." (Tr. 366.) Dr. Cooper estimated Plaintiff's intelligence to be in the "average range" and his "[i]nsight and judgment appear[ed] superficially intact." (Tr. 366.) Plaintiff "did serial threes with hesitations and multiple errors"; completed two out of three simple math problems correctly; interpreted a complex proverb accurately; recalled three out of three items immediately and two out of three items after a five-minute delay; and "knew three recent presidents sequentially." (Tr. 366-67.) Dr. Cooper noted that Plaintiff's "[j]udgement responses to standard scenarios were adequate." (Tr. 367.)

With respect to Plaintiff's daily functioning, Dr. Cooper noted that Plaintiff lives with his wife; sleeps from approximately 10:30 p.m. to 9:00 a.m.; and "makes it a point to do his daily cares." (Tr. 367.) Dr. Cooper noted that Plaintiff does some meal preparation and "usually goes shopping with his wife as by himself he has trouble making decisions and frequently gets the wrong thing, even tending to misplace a list if he brings it." (Tr. 367.) Dr. Cooper noted that Plaintiff cleans his home, but "has some difficulty keeping up with outside housework such as caulking, painting and trim work because he does not care even though it needs to be done." (Tr. 367.) Dr. Cooper noted that Plaintiff's wife pays the bills, but Plaintiff "can do most kinds of paperwork even though it takes a while and [he] has to review it multiple times." (Tr. 367.) Dr. Cooped also noted that Plaintiff does not read because of difficulties with concentration and recalling information. (Tr. 367.) Plaintiff reported watching "more television than he 'should,' up to five hours"; using a computer "a couple hours [per] week"; making canes out of lilac

vines; and occasionally going to lunch and movies with his wife.  (Tr. 367.)  Plaintiff reported that he has no friends.  (Tr. 367.)

Dr. Cooper diagnosed Plaintiff with bipolar disorder, anxiety disorder, and ADHD, and gave him a global-assessment-of-functioning ("GAF") score of 50.[4]  (Tr. 367.)  Dr. Cooper opined that Plaintiff's "mental health prognosis appears guarded considering the chronicity and complexity of his problems which seem modestly responsive to treatment."  (Tr. 367.)  Dr. Cooper further opined:  "[Plaintiff] appears to understand and follow simple directions with fair recall.  He appears able to do straight forward work for briefer periods with fragile stress tolerance, and variably adequate-potentially task related, concentration, pace, and persistence.  He appears able to work superficially with others in a supportive structured environment."  (Tr. 367.)

When Plaintiff was initially denied benefits in June 2011, state agency consultant Ann Lovko, Ph.D., concluded that Plaintiff had mild restrictions in his activities of daily living and moderate restrictions in maintaining social functioning and maintaining concentration, persistence, or pace.  (Tr. 109.)  Dr. Lovko found no episodes of decompensation of extended duration.  (Tr. 109.)

---

[4]

> The Global Assessment of Functioning Scale ("GAF") is used by clinicians to subjectively rate the social, occupational, and psychological functioning of adults on a scale of 0 to 100.  Scores of 41 through 50 indicate serious symptoms or any serious impairment in social, occupational, or school functioning.  Scores of 51 through 60 indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning.

*Ramo*, 2014 WL 896729, at *4 (citations omitted).

In July 2011, Plaintiff completed another Disability Report. (Tr. 290-95.) Plaintiff reported he began having suicidal thoughts and "deeper feelings of helplessness and disappointment" in May. (Tr. 290; *accord* Tr. 293.) Plaintiff also reported experiencing greater body fatigue and stated he was sleeping more. (Tr. 290; *accord* Tr. 293.)

Plaintiff also completed another Function Report around the same.[5] (Tr. 296.) Plaintiff's Function Report was substantially similar to his prior report. (*Compare* Tr. 270-78 *with* Tr. 296-303.) Plaintiff reported that he was now helping care for an elderly parent, including daily walks and transportation to medical appointments. (Tr. 297.) Plaintiff also said he "help[ed his] spouse." (Tr. 297.)

Plaintiff reported that his conditions affected, among other things, his ability to play guitar and socialize with his mother. (Tr. 297.) Plaintiff stated that he "cannot handle any type of stress[ or] multitask" and he is "never happy or joyful[,] always sad." (Tr. 297.) Plaintiff continued to experience sleep disturbances, including waking up on and off, restless, and bad dreams. (Tr. 297.)

Plaintiff reported doing some meal preparation including frozen food, vegetables, sandwiches, and barbecued meats. (Tr. 298.) Plaintiff reported helping with the laundry on a daily basis and mowing the lawn weekly. (Tr. 298.) Plaintiff stated that his wife leaves a to-do list for him and occasionally reminds him to complete things. (Tr. 298.)

---

[5] At times, the handwriting on this report is illegible. (*See, e.g.*, Tr. 296, 297, 298, 300, 303.)

Plaintiff now reported only going shopping "once [per] month for a couple of hours." (Tr. 299.) Plaintiff stated that working around his moods is "a daily frustration" and he is "always so nervous most days [and] can't stand it." (Tr. 300.)

Plaintiff completed another Disability Report in August. (Tr. 306, 310.) Plaintiff noted an "[i]ncrease in explosive anger attacks" and stated he felt "[m]uch less social." (Tr. 306.) Plaintiff also reported that he had not been helping around the house as much and had "more issues with spouse." (Tr. 306; *accord* Tr. 309.) Plaintiff stated that he "leave[s] home only about once [per] month" and feels "[m]ore reclusive." (Tr. 309.)

When Plaintiff was denied benefits on reconsideration, state agency consultant James M. Alsdurf, Ph.D., L.P., also found Plaintiff had mild restrictions in his activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence, or pace. (Tr. 120, 121.)

In April 2012, Dr. Shirriff completed a mental impairment questionnaire. (Tr. 377; *see* Tr. 323.) Dr. Shirriff listed Plaintiff's diagnosis as bipolar disorder and stated that he saw Plaintiff one to two times per year. (Tr. 377.) Dr. Shirriff rated Plaintiff's current GAF at 45 and listed Plaintiff's highest score in the past year as 50. (Tr. 377.) Dr. Shirriff noted that Plaintiff was currently taking lithium, Lamictal, Seroquel, Lexapro, and Klonopin. (Tr. 377.) Dr. Shirriff noted that Plaintiff experienced cognitive slowing as a side effect of the lithium and sedation from the Seroquel and Klonopin. (Tr. 377.)

When asked to describe his clinical findings, Dr. Shirriff listed: "chronic mood instability [with] periodic episodes of extreme anger, irritability." (Tr. 377.) Dr. Shirriff stated Plaintiff's diagnosis was "[f]air." (Tr. 377.) In identifying Plaintiff's signs and

symptoms, Dr. Shirriff checked the following: "[a]nhedonia or pervasive loss of interest in almost all activities"; "[d]ecreased energy"; "[t]houghts of suicide"; "[f]eelings of guilt or worthlessness"; "[g]eneralized persistent anxiety"; "[m]ood disturbance"; "[p]sychomotor agitation or retardation"; "[p]aranoid thinking or inappropriate suspiciousness"; "[b]ipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)"; "[i]ntense and unstable interpersonal relationships and impulsive and damaging behavior"; "[m]otor tension"; "[e]motional lability"; "[f]light of ideas"; "[m]anic syndrome"; "[i]nflated self-esteem," further noting "at times"; "[p]ressure of speech," further noting "at times"; "[m]emory impairment— short, intermediate or long term"; and "[s]leep disturbance." (Tr. 378.)

With respect to Plaintiff's ability to perform unskilled work, Dr. Shirriff opined that Plaintiff was limited but could still perform satisfactorily in his abilities to "[u]nderstand and remember very short and simple instructions"; "[c]arry out very short and simple instructions"; "[a]sk simple questions or request assistance"; and "[b]e aware of normal hazards and take appropriate precautions." (Tr. 379.) Dr. Shirriff further opined that Plaintiff was seriously limited but not precluded from "[s]ustain[ing] an ordinary routine without special supervision"; "[w]ork[ing] in coordination with or proximity to others without being unduly distracted"; "[m]ak[ing] simple work-related decisions"; and "[a]ccepting instructions and respond[ing] appropriately to criticism from supervisors." (Tr. 379.) Lastly, Dr. Shirriff opined that Plaintiff was "[u]nable to meet competitive standards" in his abilities to "[r]emember work-like procedures"; "[m]aintain

attention for two[-]hour segment"; "[m]aintain regular attendance and be punctual within customary, usually strict tolerances"; "[c]omplete a normal workday and workweek without interruptions from psychologically based symptoms"; "[p]erform at a consistent pace without an unreasonable number and length of rest periods"; "[g]et along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes"; and "[d]eal with normal work stress." (Tr. 379.) Dr. Shirriff left blank the portion of the questionnaire asking him to explain Plaintiff's limitations in those areas where Dr. Shirriff determined Plaintiff was seriously limited or unable to meet competitive standards and provide supporting "medical/clinical findings." (Tr. 379.)

As for performing semiskilled and skilled work, Dr. Shirriff opined that Plaintiff was limited in his ability to "[s]et realistic goals or make plans independently of others" and seriously limited in his abilities to understand, remember, and carry out detailed instructions and "[d]eal with [the] stress of semiskilled and skilled work." (Tr. 380.) Again, Dr. Shirriff did not explain Plaintiff's limitations or include supporting medical/clinical findings. (Tr. 380.)

Dr. Shirriff also opined that Plaintiff was limited in his ability to "[a]dhere to basic standards of neatness and cleanliness," "[t]ravel to unfamiliar places," and "[u]se public transportation." (Tr. 380.) Dr. Shirriff opined that Plaintiff was seriously limited in his ability to "[i]nteract appropriately with the general public" and "[m]aintain socially appropriate behavior." (Tr. 380.) Dr. Shirriff again did not explain Plaintiff's limitations or include supporting medical/clinical findings. (Tr. 380.)

With respect to certain functional limitations, Dr. Shirriff opined that Plaintiff had a moderate limitation concerning restrictions in his activities of daily living and marked limitation in social functioning and maintaining concentration, persistence, or pace. (Tr. 381.) Dr. Shirriff also noted that Plaintiff had a medically documented history of a chronic mental disorder of at least two years' duration, which caused more than minimal limitations in his ability to perform basic work activity; was currently using medication or psychosocial support to treat his symptoms; and had experienced three episodes of decompensation within 12 months, each of which had lasted at least two weeks. (Tr. 381.) Finally, Dr. Shirriff noted that Plaintiff's impairments would cause him to be absent from work approximately four days per month. (Tr. 382.)

When completing a form about his recent medical treatment in May 2012, Plaintiff stated the following in response to a question asking what his treatment providers have told him about his condition:

> Bi-polar serious mental illness. Damaged my careers and relationships. My bi-polar runs in families/genetics. Panic and anxiety symptoms. Talk therapy weekly being [illegible] and does create sadness, crying and my bi-polar may last for years (35) for me. Persons (me) have always had thoughts of suicide. Reviewing other mood disorders. Irritability, rage (arrested) for road rage. Type D personality. I have major/chronic depression.

(Tr. 325.)

# V. ALJ PROCEEDINGS & DECISION

## A. Hearing Testimony

The ALJ held a hearing on January 2, 2013. (Tr. 38.) Early in the hearing, the ALJ sought additional information from Plaintiff's attorney concerning the three episodes of decompensation of extended duration noted by Dr. Shirriff. (Tr. 43.) Counsel stated that Plaintiff had been hospitalized in the past, but not since 2006. (Tr. 43.)

The ALJ asked Plaintiff about the very last job that he had. (Tr. 46.) Plaintiff testified that he worked for Target, initially "putting out produce," until he was reassigned due to arguments with customers and coworkers. (Tr. 46.) In Plaintiff's opinion, the customers "were never right." (Tr. 46.) He was reassigned to handle carts, but was not able to shuttle the carts back fast enough. (Tr. 47.) This also resulted in arguments with customers. (Tr. 47.)

Plaintiff testified that he was no longer looking for employment. (Tr. 48.) After he left Target, Plaintiff testified that he received unemployment benefits. (Tr. 49.) When Plaintiff explained to benefits personnel that he was trying to apply for disability benefits, he was advised that he could still perform a sedentary job, such as "stuffing flyers in envelopes or doing things that really had their own pace and their own time." (Tr. 49.) Plaintiff testified that "there was no income involved," just "minimum wage," (Tr. 48), and he ultimately did not find anything, (Tr. 49).

Plaintiff testified that he is "happier" not working. (Tr. 49; *see also* Tr. 54.) Plaintiff testified that he has struggled with panic attacks since he was a child. (Tr. 49.) Plaintiff testified that when he was younger, he would have "out of reality experience[s],"

where it felt like he was looking at himself through plexiglass and watching everything happening in front of him. (Tr. 50.) Plaintiff also said he had "near death experiences where people leave their bodies and look down on themselves." (Tr. 50.) Plaintiff testified that he does not have these experiences anymore and the last one occurred probably ten years ago. (Tr. 50-51.)

Plaintiff testified that, more recently, he has had difficulty controlling his temper and concentrating, particularly reading. (Tr. 52.) Plaintiff testified that Dr. Shirriff was not able to provide an explanation for his inability to focus. (Tr. 51-52.) Plaintiff testified that he also has panic and anxiety attacks, and the last one occurred approximately one week ago. (Tr. 52.) Plaintiff explained that he was attending the funeral of a relative and many people came up to talk to him that he had not seen in years. (Tr. 52.) Plaintiff testified that "he was sweating and . . . getting this panic going that these people were talking to me and [he] wasn't sure what to say." (Tr. 52.)

Plaintiff also testified about an incident at a car dealership in 2012 over some tires. (Tr. 54.) The dealership was supposed to put a certain kind of new tires on the car. (Tr. 54.) According to Plaintiff, they did not put the right tires on and, when the dealership "refused to do anything with it," Plaintiff "exploded." (Tr. 55.) Plaintiff testified that he "was screaming," "grinding [his] teeth," and "pounding [his] fists on the top of the counter." (Tr. 55.) Plaintiff testified that "the kid behind the counter was just laughing at me, so I went around the back of the counter and looked him in the face and hit him with my chest, and said that 'It's probably a good idea that you take that grin off your face before I knock it off." (Tr. 55.) Plaintiff also told "the kid" that he was "going to have a

real problem with [Plaintiff] if [he] d[id not]." (Tr. 55.) Plaintiff also yelled at the store and maintenance managers. (Tr. 55.) Plaintiff also told the dealership to call the police. (Tr. 55.) In the end, Plaintiff got the tires he wanted, but was sick for four days after the incident. (Tr. 56.)

Plaintiff also testified about a road-rage incident in 2000. (Tr. 56.) Another driver "was riding [Plaintiff] and flipping [him] off and actually drove [Plaintiff] off the road, into the side of the road." (Tr. 56.) When the driver turned off at an exit, Plaintiff "jumped the curb and . . . followed him." (Tr. 56.) Plaintiff had nunchucks in his car from his martial arts work. (Tr. 57.) Plaintiff grabbed the nunchucks and went over to the driver's car and "exploded," yelling at the driver. (Tr. 57.) Plaintiff testified that the police were called and he was arrested for attempted assault and having an illegal weapon. (Tr. 58.) Plaintiff testified that he has not had any run-ins with law enforcement since that time. (Tr. 58.) Plaintiff testified that Dr. Shirriff described this "see[ing] red" as part of the "reptilian brain," and was part of a person's fight-or-flight response. (Tr. 59.) Plaintiff testified that he has not "seen red" since 2000. (Tr. 59.)

Michael Lace, Psy. D., testified as the medical expert. (Tr. 40, 227.) Dr. Lace began by asking Plaintiff a few additional questions. (Tr. 60.) In response to how often he sees Dr. Shirriff, Plaintiff responded every three months. (Tr. 60.) When asked about attending therapy on a regular basis, Plaintiff mentioned Beckham-Chasnoff, but stated that he typically attends therapy only "for a month or two" and then does not go back because he is "not interested" and "do[es no]t want to be bothered." (Tr. 60-61.) Plaintiff explained that he "feel[s] like . . . [he] know[s] more of what's wrong with [him]

than [the therapists] do."  (Tr. 61.)  With respect to any psychiatric hospitalizations, Plaintiff testified that he was hospitalized in 2001 and then in 2006 or 2007.  (Tr. 61.)

Dr. Lace testified that Plaintiff had the severe impairments of bipolar disorder, panic disorder with agoraphobia, and anxiety disorder.  (Tr. 62.)  Dr. Lace noted that Plaintiff had "fairly infrequent contact" with Dr. Shirriff and there were "not a lot of records in the file regarding frequent visits."  (Tr. 63.)  Dr. Lace noted that Plaintiff's GAF scores ranged between 45 and 56, but were generally around 50.  (Tr. 63.)  Based on the record, Dr. Lace opined that Plaintiff did not meet or equal listed impairments 12.04 or 12.06.  (Tr. 64.)

With respect to the B criteria, Dr. Lace testified that Plaintiff had only moderate restrictions in his activities of daily living, moderate difficulties with social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  (Tr. 64.)  Dr. Lace concluded that there had been no episodes of decompensation of extended duration. (Tr. 64.)  Dr. Lace also concluded that the C criteria had not been met. (Tr. 65.)

Dr. Lace testified that Plaintiff would require some limitations in his work environment.  (Tr. 64.)  Dr. Lace testified that Plaintiff should have only "brief and superficial contact . . . with coworkers, supervisors, and the general public."  (Tr. 64.) Plaintiff should also "be limited to routine, repetitive types of work, and in a job setting where there was no strong emphasis on speeded tasks, production line activities[,] quotas, etc."  (Tr. 65.)  Dr. Lace also testified that he disagreed with Dr. Shirriff's assessment that Plaintiff would miss about four days of work per month, stating "it'd be a matter of

seeing validation of that from other sources and during other time periods, and I hadn't seen that." (Tr. 67.)

William Villa testified as the vocational expert. (Tr. 40, 71.) The ALJ asked Villa to consider a hypothetical individual with Plaintiff's age, education, and work experience; without any exertional limitations; who was limited to unskilled work that did not require "fast[-]paced activity or high[-]production quotas" and only involved brief and superficial interaction with coworkers and supervisors and no significant interaction with the public. (Tr. 74.) Villa testified that such a person could work as a laundry worker, janitor, and handpackager. (Tr. 75-76.) Villa testified that he made adjustments to the number of these jobs available to account for the restrictions on public contact and pace/production. (Tr. 75-76.)

The ALJ then posed a second hypothetical in which the same hypothetical person previously discussed would miss work four times per month. (Tr. 76.) Villa testified that "[n]o job would tolerate that." (Tr. 77.)

Plaintiff's attorney then asked whether an employer would tolerate a person being "off task for 15 percent of the time" doing the jobs listed by Villa. (Tr. 77.) Villa testified that "20 percent" is the typical "cut-off." (Tr. 77.)

## B. ALJ Decision

The ALJ found and concluded that Plaintiff had the severe impairments of ADHD, bipolar disorder, and anxiety disorder, and none of these impairments when considered individually or in combination met or equaled listed impairments 12.02, 12.04, and 12.06 in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 19, 20.)

In considering whether the B criteria was satisfied, the ALJ found and concluded that Plaintiff had no more than moderate limitations in his activities of daily living, social functioning, and ability to maintain concentration, persistence, or pace. (Tr. 20-21.) The ALJ cited Plaintiff's ability to care for himself on a daily basis; cook simple meals; perform household chores (including cleaning and laundry), home repairs, and yardwork; go out by himself as well as go out to eat, attend movies, and shop with his wife; engage in several hobbies, including making canes out of lilac vines, watching movies, using his computer, playing guitar, bike riding, and walking; keep in contact with others by telephone and through letters and social media; and care for his elderly parents. (Tr. 20, 21.) The ALJ pointed out that the notes of Plaintiff's treatment providers did not reflect significant difficulties relating to them. (Tr. 21.) Plaintiff was observed to be well-groomed and appropriately dressed, demonstrated appropriate eye contact, was alert and oriented, had normal speech and thought patterns, had a euthymic mood and consistent affect, and maintained attention and concentration despite reporting severe depressive symptoms. (Tr. 20, 21, 22.)

The ALJ found and concluded that Plaintiff experienced no episodes of decompensation of extended duration. (Tr. 22.) The ALJ cited Plaintiff's testimony that "he had not been hospitalized for psychiatric treatment since 2006 or 2007, with no more intensive treatment options such as day treatment or a partial hospital program." (Tr. 22.) The ALJ also noted that "[t]he record including [Plaintiff's] testimony shows relatively infrequent visits to psychiatrist Dr. Sh[i]rriff and no counseling in recent years." (Tr. 22.)

As for the C criteria, the ALJ found and concluded that "[t]he record does not show a need for intensive or inpatient psychological treatment, hospitalization, or a highly structured environment, a significant lack of ability to function independently, a complete inability to function outside the home, or the likelihood of decompensation with minimal stress or changes in routine." (Tr. 22.) In reaching this conclusion, the ALJ gave great weight to Dr. Lace and his testimony that "the severe limitations opined by treating psychiatrist Dr. Shirriff . . . were not consistent with the lack of recent psychiatric hospitalization and the fairly infrequent treatment visits . . . and the limited therapy visits, which occurred only in 2012." (Tr. 22.) The ALJ also cited Dr. Lace's testimony that "the kinds of symptoms described by Dr. Shirriff in that opinion form would generally require more frequent visits and likely biweekly or weekly therapy." (Tr. 22.) These inconsistencies led the ALJ to give less weight to Dr. Shirriff's opinion. (Tr. 23.)

The ALJ found and concluded that Plaintiff had the residual functional capacity to perform a full range of unskilled work with the following additional limitations: "work that does not involve fast-paced activity or high[-]production quotas, limited to brief and superficial interaction with co-workers and supervisors, and no significant interaction with the public in the performance of job duties." (Tr. 23.) The ALJ cited Dr. Lace's testimony that Plaintiff "was able to work with limitations to at most brief and superficial contact with co-workers, supervisors, and the public, and limited to routine, repetitive types of work in a job where there was no strong emphasis on speeded tasks such as assembly line activities and the like." (Tr. 24.) Again, the ALJ cited Dr. Lace's testimony that the limitations identified by Dr. Shirriff "were not consistent with the lack

of recent psychiatric hospitalization and the fairly infrequent treatment . . . and limited therapy visits, and indicated that his assessment of a GAF score was also inconsistent with the record as a whole." (Tr. 24.) The ALJ also cited Dr. Lace's testimony that "in his opinion[,] the four absences a month were not validated in the record, though that may have been true at another time." (Tr. 24.)

The ALJ observed that "the record shows only sporadic visits to his treating psychiatrist, Dr. Shirriff, every three to four months at most, and no therapy until January 2012." (Tr. 25.) The ALJ found that Plaintiff's

> self-reporting has reflected a relatively highly level of activities of daily living and independence that is inconsistent with his overarching allegations of disability due to the combined effects of his mental impairments and with his alleged inability to control his emotional response and anger in even brief and superficial contacts with others.

(Tr. 25.) Moreover, Plaintiff's "reporting to treatment providers regarding his symptoms and the very limited course of treatment are not consistent with such severe difficulties with anger management, mood swings, concentration, and other symptoms." (Tr. 25.)

The ALJ noted that Plaintiff was on medication, which was adjusted to "account for some mood instability." (Tr. 25.) The ALJ noted that, while Plaintiff experienced some side effects as a result of these medications, Plaintiff also improved while taking them. (Tr. 25-26, 28, 29.) Accordingly, the ALJ found that the "treatment records do not support [Plaintiff's] allegations of ongoing severe difficulties with anger and rage episodes and with concentration that were not addressed sufficiently with treatment changes." (Tr. 26.)

Further, the ALJ noted inconsistencies in Plaintiff's reporting to his treatment providers. (Tr. 26.) Noting Plaintiff's financial explanation for the gap in treatment with Dr. Shirriff, the ALJ pointed out that Plaintiff "had already begun biweekly therapy with . . . Beckham-Chasnoff in January, which is somewhat inconsistent with this explanation, particularly in light of [Plaintiff's] new complaint of rage episodes, with only the one particular incident noted involving his wife's car tires." (Tr. 26.) The ALJ also noted that Plaintiff "reported instability on his medications to [Beckham-Chasnoff] that was not consistent with Dr. Shirriff's treatment notes from the same period" and "reported suicidal ideation to [Beckham-Chasnoff] but indicated to Dr. Shirriff that this was not a current, serious concern." (Tr. 24; *see* Tr. 27-28.)

Similarly, the ALJ noted that Plaintiff's "reporting to [disability personnel] about side effects of medications was not consistent with his treatment notes from Dr. Shirriff, which do not show ongoing significant side effects not addressed by medication changes." (Tr. 27.) Plaintiff also "denied depression or anxiety in a regular health maintenance visit in March 2012." (Tr. 27.) And, "much of [Plaintiff's] reporting to . . . Beckham-Chasnoff concerned incidents and conflicts that occurred before the alleged date of onset; his mixing of events from different time periods made his reporting to her less reliable as well in terms of assessing his current functioning." (Tr. 27.)

The ALJ also found inconsistencies with Plaintiff's level of activity. While Plaintiff reported low energy and anhedonia, Plaintiff "continued to do yardwork and household projects where he could go at his own pace, including planting several eight-foot trees." (Tr. 26.) Despite the claimed difficulties with attention and concentration,

Plaintiff "reported . . . that he engaged in a number of other activities involving attention and concentration, such as working on the computer including to apply for jobs, playing games, and going on Facebook, watching a lot of TV, doing household repairs and maintenance, driving, and a number of hobbies." (Tr. 27.) Plaintiff "continued to attend social events, shop, and run errands that generally require significant interaction with others despite [allegations of panic and anxiety attacks in public]." (Tr. 28.) The ALJ found that the incident at the dealership "was unusual and not a frequent occurrence and that his difficulties in social events did not prevent him from being able to attend social events." (Tr. 28.) Likewise, "[t]he relatively normal objective [mental-health] findings recorded in treatment notes are . . . more consistent with the wide range [of] reported activities of daily living than the lower GAF scores." (Tr. 28-29.)

In addition, the ALJ considered Plaintiff's work activities:

> [Plaintiff] testified that he relied on his wife's income and he had received unemployment benefits for a time, in 2010 and early 2011, and that he was happier not working. These factors suggest that [Plaintiff] had less incentive to seek and maintain full[-]time competitive work during the relevant time period. [Plaintiff] testified that he sought only sedentary work because he had been counseled that he could perform such work while seeking Social Security benefits, and that he had not found any jobs due to the poor economy and limited opportunity. [Plaintiff] also indicated that he was not interested in jobs that paid a minimum or low wage. The [ALJ] notes that the objective medical evidence does not support a finding that [Plaintiff] is limited physically or in his exertional capacity, and the alleged inability to find work that he found acceptable based on wages and job duties is not relevant to assessment of his mental residual functional capacity. [Plaintiff's] testimony regarding this work in recent jobs indicated he had more difficulty interacting with customers and with handling the stress of work requiring a

fast pace. The above residual functional capacity has been reduced to accommodate these limitations, with a limitation to brief and superficial contact with co-workers and supervisors and no interaction with the public in the performance of job duties as well as limitation to work with no fast-paced activity or high[-]production quotas. . . . [G]iven the numerous inconsistences, the record, particularly the wide range of independent activities of daily living and the very limited course of mental health treatment from the alleged date of onset forward, does not support greater mental limitations.

(Tr. 29 (citation omitted); *see* Tr. 24, 25, 30.)

In reaching these conclusions, the ALJ gave limited weight to the opinion of Dr.

Cooper, the consultative psychological examiner,

because although his opinion was based on a thorough examination and interview . . . as well as a review of some treatment records, his conclusions are not fully consistent with the whole record regarding [Plaintiff's] mental functioning as well as his own mental status examination. The conclusions that [Plaintiff] could do "straight-forward" work for only briefer periods of time with fragile stress tolerance and the conclusion that [Plaintiff] had only "variably adequate-potentially task related-concentration, persistence, and pace" appears to have been based excessively on [Plaintiff's] subjective reporting to him, as it is not consistent with the very limited course of mental health treatment, the stable condition reflected in treatment notes, and [Plaintiff's] wide range of independent activities of daily living, as reported to him and reflected in the larger record. Dr. Cooper's conclusion that [Plaintiff's] symptoms seemed only modestly responsive to treatment is not consistent with Dr. Shirriff's records showing a generally stable condition with minimal complaints of consistent, ongoing difficulty functioning in particular areas of functioning.

(Tr. 30 (citation omitted).)

The ALJ stated that he gave less weight to Dr. Shirriff's April 2012 opinion

because although he has treated [Plaintiff] since long before the alleged date of onset, he was noted as only seeing [Plaintiff] once or twice a year at that point and his conclusions are not consistent with this frequency of treatment visits, his treatment notes from the relative time period, or the larger record including [Plaintiff's] activities of daily living. Dr. Shirriff's conclusions appear to be based at least in part on excessive reliance on [Plaintiff's] subjective reporting to him regarding his ability to work and on [Plaintiff's] condition in the distant past, when he did require psychiatric hospitalization and did have legal involvement prior to stabilization on psychiatric medications. The objective medical evidence in the record does not show any need for more intensive treatment options from the alleged date of onset forward, . . . and therefore conflicts greatly with Dr. Shirriff's conclusion that [Plaintiff] had experienced three episodes [of decompensation] in a 12-month period, each at least two weeks long. This suggests that Dr. Shirriff was unfamiliar with the definitions of these terms and the definition of disability provided in the Social Security regulations. . . . The limited mental health treatment and generally stable condition from the alleged date of onset forward reflected in those records also does not support the need for four or more absences a month due to mental symptoms or treatment.

(Tr. 30 (citation omitted).)

The ALJ gave "significant weight to the opinions of the State agency psychological consultants because they are familiar with assessment of medical conditions in accordance with Social Security regulations regarding the evaluation of disability and their opinions are mostly consistent with the whole record regarding the claimant's mental impairments." (Tr. 30-31.) The ALJ did note, however, that Plaintiff's testimony at the hearing regarding arguments with customers and the dealership incident "indicate[d] that no contact with the public is more appropriate." (Tr. 31.) Additionally,

> [t]he record at the hearing level also indicates that, noting some difficulty making calculations and with recall in the consultative examination and giving limited weight to [Plaintiff's] allegations regarding difficulties meeting requirements of a faster pace and difficulty managing the stress of such activity, is more consistent with a limitation to unskilled work and to no fast pace or high[-]production quotas.

(Tr. 31.)  Accounting for these limitations, the ALJ found that jobs exist in significant numbers in the national economy that Plaintiff is able to perform given his age, education, work experience, and residual functional capacity, and Plaintiff is not under a disability.

## VI. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole.  *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).  "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision."  *Id.*  This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it."  *Id.*  The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ."  *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012).  "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision."  *Id.* (quotation omitted).

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 423(a)(1); *accord* 20 C.F.R. § 404.315. An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *see* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010); *see also* 20 C.F.R. § 404.1520(a)(4). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a).

Plaintiff asserts that the ALJ erred in his treatment of Dr. Shirriff's opinion[6] and in determining that Plaintiff's impairments did not meet listing 12.04(A)(3)[7]. (Pl.'s Mem. in Supp., ECF No. 10.) These issues are somewhat intertwined.

Plaintiff asserts that he meets listing 12.04(A)(3) for bipolar disorder based on the presence of the A and B criteria.[8] (Pl.'s Mem. in Supp. at 16-17; *see* Pl.'s Reply at 4.) To meet listing 12.04(A)(3), a claimant must have "[b]ipolar syndrome with a history of episodic periods manifested by the fully symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)," 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(A)(3), which "[r]esult[s] in at least two of the following: 1. [m]arked restrictions of activities of daily living; or 2. [m]arked difficulties in maintaining social functioning; or 3. [m]arked difficulties in maintaining concentration, persistence, or pace; or 4. [r]epeated episodes of decompensation, each of extended duration," 20 C.F.R. pt. 404, subpt. P, app. 1, 12.04(B).

The Commissioner asserts that Plaintiff "failed to show that he had the required manic and depressive episodes" under the A criteria for bipolar disorder. (Comm'r's Mem. in Supp. at 21, ECF No. 12.) Plaintiff's bipolar disorder is well-documented throughout the record—by treating psychiatrist Dr. Shirriff, therapist Beckham-Chasnoff, consultative examiner Dr. Cooper, and testifying medical expert Dr. Lace. The ALJ

---

[6] At one point, Plaintiff asserts that the ALJ "substantially ignored the statements, findings, and medical opinions of [his] long-time treating psychiatrist, John Shirriff, M.D.; the opinions of his therapist, Candace Beckham-Chasnoff, MS, LM, FT; and consultative examiner, John Cooper, Psy.D." (Pl.'s Mem. in Supp. at 1.) Yet, Plaintiff's arguments focus only on the treatment of Dr. Shirriff's opinion. (*See* Pl.'s Mem. in Supp. at 8-16; *see also* Pl's Reply at 1 (plaintiff meets listing "based upon the only treating source in the record"), ECF No. 13.)
[7] While Plaintiff referred to listing 1.04 in his principal memorandum, (Pl.'s Mem. in Supp. at 16, 17), he clarified in his reply memorandum that he meant listing 12.04(A)(3), (Pl.'s Reply at 1; *see* Pl.'s Mem. in Supp. at 17).
[8] Plaintiff does not assert that he meets the C criteria and therefore the Court has not considered it.

found Plaintiff's bipolar disorder was a severe impairment and moved directly into considering whether the B and C criteria were also present. (Tr. 19, 20-23.) Therefore, for purposes of these motions, the Court assumes Plaintiff has met the A criteria.

Turning to the B criteria, Plaintiff relies on the opinion of treating psychiatrist Dr. Shirriff that he has marked difficulties in *both* maintaining social functioning and maintaining concentration, persistence, or pace, and thus has two of the requisite criteria.[9] Plaintiff asserts that the ALJ failed to give adequate weight to the opinion of Dr. Shirriff.

## A. Dr. Shirriff

### 1. Weight of Opinion

Plaintiff argues that the ALJ went "far out of his way to attempt to locate conflicts and inconsistencies in the medical reports of long-time treating psychiatrist, Dr. Shirriff[,] and consulting examiner, Dr. Cooper." (Pl.'s Mem. in Supp. at 10.) Plaintiff argues that the ALJ mischaracterized the frequency with which Plaintiff saw Dr. Shirriff and Dr. Shirriff "continued to prescribe . . . very serious medication" to Plaintiff. (Pl.'s Mem. in Supp. at 10.) Plaintiff repeatedly emphasizes the lengthy treatment relationship he had with Dr. Shirriff and the fact that the record before the ALJ contained only treatment records from 2009, 2010, and 2011. (Pl.'s Mem. in Supp. at 10, 11; *accord* Pl.'s Reply at 2, ECF No. 13.) Plaintiff argues that, because the entirety of Dr. Shirriff's treatment records were not included, the ALJ found inconsistencies when things Plaintiff reported

---

[9] Plaintiff does not assert that he has marked restrictions in his activities of daily living. Indeed, Dr. Shirriff opined that Plaintiff has only moderate restrictions in this area. (Tr. 381.) Further, while Dr. Shirriff opined that Plaintiff had three episodes of decompensation of extended duration, (Tr. 381), Plaintiff does not appear to be contesting the ALJ's finding that any episodes of decompensation did not occur during the relevant time period or conclusion that Dr. Shirriff was unfamiliar with these terms as used in the Social Security regulations, (Tr. 22, 30).

to Dr. Cooper were not in Dr. Shirriff's records. (Pl.'s Mem. in Supp. at 11-12.) Plaintiff reasons that "[w]e do not know if those [things] are consistent with Dr. Shirriff's medical records because we only have three years of those records." (Pl.'s Mem. in Supp. at 12.) Plaintiff argues that, at the hearing, he testified to the same experiences reported to Dr. Cooper, and Dr. Cooper and Dr. Shirriff's evaluations were "very similar." (Pl.'s Mem. in Supp. at 11, 12.)

The Commissioner counters that the ALJ considered the appropriate factors in weighing Dr. Shirriff's opinion. The Commissioner points out that, at the time Dr. Shirriff completed the mental health impairment questionnaire, Dr. Shirriff himself reported that he saw Plaintiff one or two times per year. (Comm'r's Mem. in Supp. at 9, ECF No. 12.) Yet, at the same time, the marked difficulties and episodes of decompensation identified by Dr. Shirriff were inconsistent with his own treatment notes and would have required more intensive treatment. (Comm'r's Mem. in Supp. at 9.) In particular, the Commissioner points to Dr. Shirriff's notes regarding Plaintiff's work efforts, thus "demonstrat[ing] an ability and willingness to work during a time when Dr. Shirriff stated that [Plaintiff] was severely debilitated." (Comm'r's Mem. in Supp. at 10; *accord* Comm'r's Mem. in Supp. at 9.) The Commissioner asserts that

> the ALJ was correct to discount Dr. Shirriff's opinion that Plaintiff was debilitated by his mental condition when Dr. Shirriff's treatment records showed that Plaintiff worked at least part time, was a caretaker to others, was doing "OK," was holding himself out as ready to work, and had turned down job offers for reasons unrelated to his mental functioning.

(Comm'r's Mem. in Supp. at 11.)  Additionally, the Commissioner asserts that the ALJ properly discounted Dr. Shirriff's opinion because it relied excessively on subjective complaints and because Dr. Shirriff did not appear to understand how episodes of decompensation are defined in the Social Security regulations, i.e., he concluded that Plaintiff had suffered such episodes when there was no evidence in the record that these episodes occurred during the relevant time period.  (Comm'r's Mem. in Supp. at 11-12.)

The Commissioner further asserts that the ALJ properly considered Dr. Lace's expert testimony in discounting Dr. Shirriff's credibility, citing Dr. Lace's observations about Plaintiff's infrequent contact with Dr. Shirriff and the lack of supporting data for the GAF scores as well as his expectation that the limitations identified would require more intensive treatment.  (Comm'r's Mem. in Supp. at 14-15.)

There is no dispute that Dr. Shirriff is a treating physician.  Accordingly,

> [u]nder the [S]ocial [S]ecurity regulations, the [C]ommissioner will generally give a treating physician's opinion on the issue(s) of the nature and severity of claimant's impairment(s) controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record.

*Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014) (quotation omitted); *accord* 20 C.F.R. § 1527(c)(2); *Bernard v. Colvin*, 774 F.3d 482, 487 (8th Cir. 2014).  "Yet[, this "controlling weight"] is neither inherent nor automatic and does not obviate the need to evaluate the record as a whole."  *Cline*, 771 F.3d at 1103 (citation and quotation omitted); *accord Bernard*, 774 F.3d at 487 ("Since the ALJ must evaluate the record as a whole, the opinions of treating physicians do not automatically control.").  "The [C]ommissioner

may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Cline*, 771 F.3d at 1103 (quotation omitted); *see Bernard*, 774 F.3d at 487 ("An ALJ may also give less weight to a conclusory or inconsistent opinion by a treating physician.").

When a treating physician's opinion is not given controlling weight, the opinion is weighed based on a number of factors, including the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, evidence in support thereof, its consistency with the record as a whole, the specialization of the source, and other factors. 20 C.F.R. § 404.1527(c)(2); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). "Whether granting a treating physician's opinion substantial or little weight, the [C]ommissioner must always give good reasons for the weight she gives." *Cline*, 771 F.3d at 1103 (quotation omitted).

Here, for the reasons that follow, the ALJ properly weighed Dr. Shirriff's opinion according to the factors set forth in 20 C.F.R. § 1527(c), recognizing the length of Dr. Shirriff's treatment relationship with Plaintiff, but also taking into account the infrequency of Plaintiff's visits in more recent years, the extent of the treatment provided, the lack of support for Dr. Shirriff's opinion in his treatment notes, and the inconsistency between Dr. Shirriff's opinion and Plaintiff's reported activities.[10]

---

[10] While the ALJ did not expressly address the specialization factor, he frequently referred to Dr. Shirriff as a psychiatrist. (Tr. 24, 25, 30; *see* Tr. 27.) *See* 20 C.F.R. § 1527(c)(5).

Greater weight is given to the opinions of treating sources who have seen a claimant "a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment." 20 C.F.R. § 1527(c)(2)(i). The ALJ was keenly aware that Dr. Shirriff "has treated [Plaintiff] since long before the alleged date of onset," but contrasted the length of the treatment relationship with the infrequency of more recent visits. The ALJ correctly observed that Plaintiff saw Dr. Shirriff "every three to four months at most."[11] (Tr. 25.) The record shows that Plaintiff saw Dr. Shirriff four times in 2009, two times in each of 2010 and 2011, and three times in 2012. Significantly, Dr. Lace commented on the infrequency of Plaintiff's visits to Dr. Shirriff. Moreover, while Plaintiff did express some financial difficulties during this time, the ALJ found this explanation "somewhat inconsistent" given that he had begun therapy with Beckham-Chasnoff. (Tr. 26.)

In looking at the treatment Plaintiff received, *see* 20 C.F.R. § 1527(c)(2)(ii), the ALJ observed that Plaintiff was primarily treated with medication and "has not been referred for more intensive treatment options such as day treatment or a partial hospital program." (Tr. 25.) The ALJ also observed that Plaintiff benefitted from the lithium. (Tr. 26.) The ALJ found that this "very limited course of treatment [is] not consistent with such severe difficulties with anger management, mood swings, concentration, and

_____

[11] Plaintiff asserts that the ALJ found Plaintiff saw Dr. Shirriff only "once or twice a year." (Pl.'s Mem. in Supp. at 10.) It appears that Plaintiff inadvertently omitted from his quotation the ALJ's reference to the particular point in time: "The undersigned gives less weight to the opinion of treating psychiatrist, Dr. Shirriff, *dated April 27, 2012*, because although he has treated the claimant since long before the alleged date of onset, he noted that he was only seeing the claimant *once or twice a year at that point* . . . ." (Tr. 30 (emphasis added).)

other symptoms."  (Tr. 25; *accord* Tr. 29 ("the very limited course of mental health treatment").)

The more a medical opinion is supported by relevant evidence, the more weight the opinion will receive.  20 C.F.R. § 1527(c)(3).  The ALJ observed that Dr. Shirriff's opinion "appear[ed] to be based at least in part on excessive reliance on [Plaintiff's] subjective reporting to him regarding his ability to work and on [Plaintiff's] condition in the distant past, when he did require psychiatric hospitalization and did have legal involvement prior to stabilization on psychiatric medications."  (Tr. 30.)  *See Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011) (substantial evidence supported ALJ's decision to discount consulting psychologist's assessment of claimant's limitations where limitations were based on claimant's subjective complaints, not objective findings).  The ALJ found that the 2009-2012 "treatment records do not support [Plaintiff's] allegations of ongoing severe difficulties with anger[,] . . . rage episodes[,] and . . . concentration that were not addressed sufficiently with treatment changes," citing notes about Plaintiff's activity levels, improvements on medication, and "generally normal psychiatric signs consistent with past visits."  (Tr. 26; *see* Tr. 25.)  The ALJ also pointed out the absence of treatment notes concerning "severe difficulties controlling anger and relating to others" until the incident in 2012.  (Tr. 26.)  *See Owen v. Astrue*, 551 F.3d 792, 799 (8th Cir. 2008) (ALJ properly discounted treating physician's opinion when inconsistent with treatment notes); *accord Myers v. Colvin*, 721 F.3d 521, 525 (8th Cir. 2013) ("We conclude that substantial evidence supports the ALJ's determination that Dr. Horvath's

opinion was inconsistent with the treatment record and thus not entitled to controlling weight.").

In particular, the ALJ focused on the inconsistency between Dr. Shirriff's opinion and Plaintiff's reported activities demonstrating greater abilities in social functioning and maintaining concentration. "It is an error to given an opinion controlling weight simply because it is the opinion of treating source . . . if it is inconsistent with the other substantial evidence in the case record." Social Security Ruling 96-2p, 1996 WL 374188, at *2 (Social Security Administration July 2, 1996) (SSR 96-2p). The ALJ repeatedly emphasized that "[Plaintiff's] self-reporting has reflected a relatively high level of activities of daily living and independence," (Tr. 25), including work activities, taking care of his elderly parents, yard work, household projects, going out with his wife, and "a number of activities involving attention and concentration, such as working on the computer including to apply for jobs, playing games and going on Facebook, watching a lot of TV, doing household repairs and maintenance, driving, and a number of hobbies," (Tr. 27; *accord* Tr. 29 ("wide range of independent activities of daily living").) An ALJ may permissibly discount the opinion of a treating source when the claimant's own activities are inconsistent with that opinion. *See* SSR 96-2p, 1996 WL 374188, at *3 ("Sometimes, there will be an obvious inconsistency between the opinion and other substantial evidence; for example, when a treating source's report contains an opinion that the individual is significantly limited in the ability to do work-related activities, but the opinion is inconsistent with statements of the individual's spouse about the

individual's actual activities . . . ."); *see also Owen*, 551 F.3d at 799; *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).

Plaintiff is correct that "[t]he opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence in the record as a whole." *Shontos*, 328 F.3d at 427; *accord Teague*, 638 F.3d at 615 ("A single evaluation by a nontreating psychologist is generally not entitled to controlling weight."). (Pl.'s Mem. in Supp. at 9.) In this case, however, there is substantial evidence on the record as a whole to support the reasons the ALJ gave for discounting Dr. Shirriff's opinion and giving greater weight to the state agency assessments and Dr. Lace's opinion.[12] *See Smith*, 756 F.3d at 626-27; *see also Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) ("Certainly, there are circumstances in which relaying on a non-treating physician's opinion is proper."). "It is the function of the ALJ to weigh conflicting evidence and to resolve disagreements among physicians." *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007); *accord Cline*, 771 F.3d at 1103.

## 2. Development of the Record

Lastly, Plaintiff asserts that the ALJ failed to develop the record with respect to Dr. Shirriff. Plaintiff asserts that the ALJ saw an incomplete picture because the record did not contain all of Dr. Shirriff's treatment records from the last ten-plus years and the

---

[12] Plaintiff's apparent challenge to Dr. Lace's qualifications as a psychologist rather than a psychiatrist come too late. (Pl.'s Mem. in Supp. at 14 n.5; Pl.'s Reply at 3.) *See Lemle v. Comm'r of Soc. Security*, No. 11-10295, 2012 WL 1059787, at *1 (E.D. Mich. Mar. 29, 2012) ("The Court agrees with the Magistrate Judge that Plaintiff waived the ability to challenge the experts' credentials by failing to raise the issue during the hearing before the ALJ."); *Boone v. Astrue*, Civil Action No. JKB-09-2055, 2010 WL 4455928, at *3 n.3 (D. Md. Nov. 8, 2010) (claimant's dispute to medical expert's credentials "comes too late" where claimant "specifically waived objection on that ground" at the hearing before the ALJ"). At the hearing, the ALJ asked Plaintiff's counsel if he had any objections to Dr. Lace's qualifications and he stated he had none. (Tr. 41.)

ALJ had a duty to recontact Dr. Shirriff to resolve any apparent inconsistencies. (Pl.'s Mem. in Supp. at 11, 12, 15-16.) The Commissioner counters that, "[w]hile Plaintiff several times alludes to the importance of Dr. Shirriff's records dated before August 15, 2009, there is no dispute about Plaintiff's alleged onset date," regardless of whether Plaintiff manifested some symptoms at an earlier point in time. (Comm'r's Mem. in Supp. at 12.) The Commissioner also points out that Plaintiff bears the ultimate burden of proving disability and could have obtained additional records as he saw fit. (Comm'r's Mem. in Supp. at 13.)

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case. However, the burden of persuasion to prove disability and demonstrate [residual functional capacity] remains on the claimant." *Vossen*, 612 F.3d at 1016 (citation and quotation omitted); *accord Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). "The ALJ must neutrally develop the facts. He does not, however, have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Stormo*, 377 F.3d at 806 (citation omitted); *accord Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) ("Although [the duty to fully develop the record] may include re-contacting a treating physician for clarification of an opinion, that duty arises only if a crucial issue is undeveloped.").

Plaintiff argues that it is "not know[n]" whether the hallucinations and out-of-reality experiences described to Dr. Cooper "are [in]consistent with Dr. Shirriff's medical records because we only have three years of those records." (Pl.'s Mem. in Supp. at 12.)

Plaintiff argues that, "[h]ere, neither the ALJ nor [Dr. Lace] reviewed the first six years of the treatment records of Dr. Shirriff. Therefore, these decisions and opinions lack foundation." (Pl.'s Mem. in Supp. at 16.) A claimant "must provide medical evidence showing that [he] ha[s] an impairment(s) and how severe it is during the time [he] say[s] he that [he is] disabled." 20 C.F.R. § 404.1512(c); *see Vossen*, 612 F.3d at 1016; *Stormo*, 377 F.3d at 806. Plaintiff does not identify what these additional records are likely to show—indeed, Plaintiff himself states that it is not known whether the records are consistent. The fact that these records might provide more information regarding the out-of-reality and "seeing red" experiences Plaintiff had in the past as well has his prior hospitalizations is of little moment in determining Plaintiff's functional abilities during the relevant time period when Plaintiff himself testified that these things occurred roughly seven to ten years ago, which, at the latest, was approximately three years before Plaintiff's alleged date of onset.

Further, "[t]he ALJ does not 'have to seek additional clarifying statements from a treating physician unless a *crucial issue* is undeveloped.'" *Vossen*, 612 F.3d at 1016 (alteration in original) (quoting *Stormo*, 377 F.3d at 806); *compare* 20 C.F.R. § 404.1520b(b) ("If any of the evidence in your case record, including any medical opinion(s), is inconsistent, we will weigh the relevant evidence and see whether we can determine whether you are disabled based on the evidence we have."), *with* § 404.1520b(c) ("We may recontact your treating physician, psychologist, or other medical source" where the evidence in the record is consistent but "insufficient to

determine whether you are disabled.").[13]  The ALJ is "not require[d] . . . to recontact a treating physician whose opinion is inherently contradictory or unreliable.  This is especially true when the ALJ is able to determine from the record whether the [claimant] is disabled."  *Hacker*, 459 F.3d at 938.  And, "[o]rdinarily, development should not be undertaken for the purpose of determining whether a treating source's medical opinion should receive controlling weight if the case record is otherwise adequately developed."  SSR 96-2p, 1996 WL 374188, at *4.  Plaintiff does not identify how his abilities to maintain social functioning and maintain concentration, persistence, or pace were undeveloped for the relevant period and, for the reasons discussed in the next section, there is substantial evidence in the record as a whole to support the ALJ's conclusion that Plaintiff had only moderate limitations in these areas.  The ALJ was not required to obtain additional treatment records outside the relevant period or recontact Dr. Shirriff.

### B.  Listing 12.04(A)(3)

Having concluded that the ALJ did not err in giving less weight to the opinion of Dr. Shirriff, the Court returns to the question of whether there is substantial evidence in the record as a whole to support the ALJ's conclusion that Plaintiff's bipolar disorder did not result in marked difficulties in maintaining social functioning and maintaining concentration, persistence, or pace.

A mental impairment's "alleged severity must be supported by other information in the record about the claimant's ability to function."  *Stormo*, 377 F.3d at 808; *see*

---

[13] As the Commissioner correctly points out, Plaintiff relies on a prior version of 20 C.F.R. § 1512(e) to support his argument that the ALJ had a duty to recontact Dr. Shirriff.  (Comm'r's Mem. in Supp. at 17-18; *see* Pl.'s Mem. in Supp. at 15-16.)  This regulation now addresses consultative examinations.  *See* 20 C.F.R. § 1512(e) (obtaining a consultative examination).

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A) ("The functional limitations in paragraph[]

B . . . must be the result of the mental disorder described in the diagnostic

description, that is manifested by the medical findings in paragraph A.").  A "marked"

limitation is a limitation that is "more than moderate but less than extreme."  20 C.F.R.

pt. 404, subpt. P, app. 1, § 12.00(C).  "A marked limitation may arise when several

activities or functions are impaired, or even when only one is impaired, as long as the

degree of limitation is such as to interfere seriously with your ability to function

independently, appropriately, effectively, and on a sustained basis."  *Id.*

### 1.  Social Functioning

Under the regulations, "[s]ocial functioning refers to [a claimant's] capacity to

interact independently, appropriately, effectively, and on a sustained basis with other

individuals."  *Id.* § 12.00(C)(2).  Impaired social functioning may be demonstrated "by,

for example, a history of altercations, evictions, firings, fear of strangers, avoidance of

interpersonal relationships, or social isolation."  *Id.*  Strength in social functioning may be

demonstrated "by such things as [a claimant's] ability to initiate social contacts with

others, communicate clearly with others, or interact and actively participate in group

activities."  *Id.*

The ALJ found Plaintiff had moderate difficulties in maintaining social

functioning, noting that Plaintiff engaged in a variety of social activities including,

among others, shopping, going out to eat, and attending movies with his wife; keeping in

touch with others by phone and through social medial; caring for his elderly parents;

going out alone; attending church; going to the library; and visiting family.  The ALJ also

noted that Plaintiff had no trouble relating to his treatment providers. Although addressed in a different section of the ALJ's decision, the ALJ further noted Plaintiff's recent attendance at the funeral of a relative. Moreover, the ALJ characterized the dealership incident as "unusual and not a frequent occurrence" and observed that Plaintiff's "difficulties in social events did not prevent him from being able to attend social events." (Tr. 28.) Elsewhere, the ALJ observed that the severe social difficulties alleged by Plaintiff were not borne out in recent treatment notes.

Plaintiff cites to the GAF scores he received from Dr. Shirriff, a current score of 40 and a high score of 50 within the past year. (Pl.'s Mem. in Supp. at 16.)

> With respect to GAF scores, "the Commissioner has declined to endorse the GAF scale for use in the Social Security and SSI disability programs." *Halverson,* 600 F.3d at 930–31 (quotation omitted); *see also Jones v. Astrue,* 619 F.3d 963, 975 (8th Cir.2010) (noting Commissioner's position that GAF scores do not have a direct correlation to the severity requirements for mental disorders). Nevertheless, "the GAF scores may still be used to assist the ALJ in assessing the level of a claimant's functioning." *Halverson,* 600 F.3d at 931. But, as with other evidence, "[t]he ALJ is permitted to give less weight to GAF scores if they are inconsistent with medical records as a whole." *Mortensen v. Astrue,* No. 10–cv–4976 (JRT/JJG), 2012 WL 811510, at *5 (D. Minn. Mar. 12, 2012); *accord Jones,* 619 F.3d at 974 ("an ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it" (internal quotation omitted)).

*Perry v. Colvin*, No. 13-cv-1185 (JNE/TNL), 2014 WL 4113015, at *55 (D. Minn. Aug. 20, 2014).

> A history of GAF scores at or below 50 demonstrates that the person has "serious symptoms or serious impairment in social, occupational, or school functioning." *Halverson,* 600 F.3d at 931 (citing *Pate–Fires v. Astrue,* 564 F.3d 935, 944

(8th Cir.2009)); *accord* Diagnostic and Statistical Manual of Mental Disorder 34 (American Psychological Association 4th ed. text revision 2000) ("DSM–IV–TR"). Such scores, however, do not mandate a finding of disability. *See Mortensen,* 2012 WL 811510, at *4 ("*Pate–Fires* did not hold that a history of GAF scores below 50 conclusively demonstrates that the claimant is disabled.").

*Id.* at *56.

The ALJ observed that the "scores assessed by treatment providers and the consultative examiner varied, with a GAF score of 45 in April 2012, but scores ranging around 50." (Tr. 28.) The ALJ stated, however,

> [t]he relatively normal objective findings recorded in the treatment notes are . . . noted to be more consistent with the wide range reported activities of daily living than the lower GAF scores. Thus, the GAF scores in the record are given less weight than the narrative portions of treatment notes and mental status examinations and the claimant's activities of daily living.

(Tr. 28-29.)

"In determining whether the ALJ's decision is supported by substantial evidence, the Court is to consider the entire administrate record, but not reweigh the evidence." *Perry*, 2014 WL 4113015, at *50 (citing *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012)). The ALJ's conclusion that Plaintiff is moderately impaired in his ability to maintain social functioning is supported by substantial evidence in the record as a whole, and reflects the fact that, while Plaintiff experiences some difficulties interacting with others, he also continues to engage in a variety of activities requiring social interaction despite such difficulties. *See Perry*, 2014 WL 4113015, at *50 ("The ALJ's conclusion that Plaintiff is moderately impaired in her social functioning reflects the general

difficulties Plaintiff experienced when interacting with others but at the same time recognizes Plaintiff's ability to respond appropriately and effectively during brief interactions.").

## 2. Concentration, Persistence, or Pace

"Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(3). "[M]ajor limitations in this area can often be assessed through clinical examination or psychological testing. Whenever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence." *Id.* Concentration can be assessed by having a person "subtract serial sevens or serial threes from 100" and "through tasks requiring short-term memory or . . . that must be completed within established time limits." *Id.* A person "may be able to sustain attention and persist at simple tasks but may still have difficulties with complicated tasks. Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this . . . criterion." *Id.*

In concluding that Plaintiff had only moderate restrictions in maintaining concentration, pace, or persistence, the ALJ again focused on Plaintiff's varied activities. The ALJ also noted, among other things, that Plaintiff watched television for up to five hours per day and used his computer a couple of hours per week. The ALJ noted Plaintiff's reported difficulties with "fast-paced work" and that Plaintiff "could do paperwork, taking longer and reviewing it multiple times." (Tr. 21.) The ALJ noted

Plaintiff's generally normal mental status examination with Dr. Cooper, but also that Plaintiff had difficulty with serial threes. Similarly, the ALJ noted that Beckham-Chasnoff observed "intact attention and concentration, and normal memory." (Tr. 22.)

As previously discussed, the ALJ properly weighed the opinion of Dr. Shirriff—the person who concluded Plaintiff had marked restrictions in maintaining concentration, persistence, or pace. The ALJ gave limited weight to Dr. Cooper's opinion that Plaintiff "could do 'straight-forward' work for only briefer periods of time with fragile stress tolerance" and "had only 'variably adequate—potentially task related—concentration, persistence, and pace'" because this opinion "appears to have been based excessively on [Plaintiff's] subjective reporting to him, as it is not consistent with the very limited course of mental health treatment, the stable condition reflected in treatment notes, and the claimant's wide range of independent activities of daily living." (Tr. 30.) Dr. Lace and the state agency consultants concluded that Plaintiff had moderate restrictions in maintain concentration, persistence, or pace.

"This court cannot reweigh the evidence or review the factual record de novo." *Smith*, 756 F.3d at 626 (quotation omitted). Weighing conflicting evidence is the function of the ALJ. *Cline*, 771 F.3d at 1103; *Perry*, 2014 WL 4113015, at *51. "In light of the deferential standard of review and the evidence before the ALJ, this Court cannot conclude that the ALJ erred in determining that Plaintiff was not markedly limited in h[is] ability to maintain concentration, persistence, [or] pace." *Perry*, 2014 WL 4113015, at *51.

In sum, the Court concludes that there is substantial evidence in the record as a whole to support the ALJ's determination that Plaintiff did not have marked restrictions in the areas of maintaining social functioning and concentration, persistence or pace. Therefore, because Plaintiff did not meet at least two of the B criteria, the ALJ did not err in concluding that Plaintiff's bipolar disorder did not meet listing 12.04(A)(3). *See Roberson v. Astrue*, 481 F.3d 1020, 1023 (8th Cir. 2007) (claimant's bipolar disorder did not meet listing 12.04(A)(3) when "she did not offer medical evidence to support a finding that her limitations in [the areas of maintaining social functioning and maintaining concentration, persistence, or pace] were 'marked' or rose to a degree that prevented her from functioning satisfactorily").

[Continued on next page.]

## VII. RECOMMENDATION

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (ECF No. 9) be **DENIED** and Defendant's Motion for Summary Judgment (ECF No. 11) be **GRANTED**.

Dated: July__28___, 2015

_____s/ Tony N. Leung_____
Tony N. Leung
United States Magistrate Judge
for the District of Minnesota

*Rose v. Colvin*
Case No. 14-cv-848 (PJS/TNL)

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.